Opinion issued December 1, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-08-00709-CR

———————————

Alonzo Joseph Johnson, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 337th District Court

Harris County, Texas



Trial Court Case No. 1139843

 



 

MEMORANDUM OPINION

          A
jury convicted appellant, Alonzo Joseph Johnson, of the first degree felony
offense of murder and assessed punishment at confinement for life.[1]  In one issue on appeal, appellant contends
that the trial court violated the Sixth Amendment and his right to be heard by
counsel when it limited closing arguments to twenty minutes.

          We
affirm.

Background

          Around
5:30 p.m. on October 29, 2007, Misty Woods, who lived at the Beckford Place
Apartments in southwest Harris County with her boyfriend Gerard Gordon, the
complainant, had a conversation with appellant, whom she knew as “Zo.”  During this conversation, appellant told
Misty to inform Gordon that “[appellant] was not playing with [Gordon]” and
that “[Gordon] knows [appellant] walks around with his heater on him,” referring
to his gun.  Appellant also said that he
wanted $100 that Gordon allegedly owed to him. 
When Misty offered to pay him the $100, appellant informed her that her
money “was no good.”  According to Misty,
appellant then stated, “I gave him the dope; so, I want my money from
him.”  Misty returned to her apartment
and told Gordon about this conversation. 
Misty then left the complex to go visit her mother, but she returned several
hours later at Gordon’s request.

          After
Misty returned, someone knocked on the apartment door, and Gordon, who
regularly washed cars for the residents of the complex, took his cleaning supplies
downstairs.  Misty testified that it was
unusual for someone to ask him to wash a car so late at night.  Misty then walked downstairs to a neighbor’s
apartment.  As she was walking back to
her apartment, she heard four gunshots followed by a pause and then a fifth
gunshot.  Misty ran back to her
apartment, looked out of her bedroom window, and saw appellant’s car, a Lexus, driving
slowly out of the complex followed by another Lexus.  Misty recognized appellant’s car by the distinctive
“504” stickers on the sides and a “For Sale” sign on the back window.[2]

          Misty
testified that she ran downstairs to find Gordon.  She first stated that the complex’s security
guard had already called 911, but she then stated that she arrived at the scene
before anyone else.  She testified that
Gordon was still alive when she reached him and she asked, “Who did this to
you?”  Gordon weakly responded and said,
“Zo.”[3]  Misty further testified that while she was
sitting in a police car at the scene, she saw appellant return to the complex
and immediately leave when he saw the police still present.  She stated that she banged on the window to
get the officers’ attention, but they ignored her.

          Rose
Davis, who lived in the apartment below Gordon, also identified appellant as
“Zo.”  Rose stated that around 10:00
p.m., she was standing in the stairwell of her building with Gordon and two
other men when appellant drove past.  Appellant
walked over to the stairwell while two other men got out of his car and walked
over to other buildings in the complex.  Rose
testified that she greeted appellant as he walked up the stairs, but he did not
respond, which was unusual.  Appellant
looked at Gordon, whistled over the railing to the other men with him, and then
walked back to his car and talked with the other men.  Rose testified that she observed that
appellant had a gun with him.  Rose then
went into her apartment, and while she was inside she heard four gunshots, a
pause, and one more gunshot.  Through her
window, she saw appellant get into his car and drive out of the complex.  According to Rose, appellant drove at a
“creeping” speed, without his headlights on, and no other cars followed him.

          On
cross-examination, Rose admitted that the low light in the stairwell made it
difficult for her to see clearly, so appellant might not have been carrying a
weapon.  She also testified that one of
the men speaking with Gordon in the stairwell was a known drug dealer, and she
did not see him after the shooting.  She further
stated that she was unable to identify the two other men with appellant and
that a dark four-door Lexus was usually parked at the complex.

          Robert
Rigby, the courtesy officer at the Beckford Place Apartments, testified that he
received a call from a tenant around 10:30 p.m. regarding an incident at the
complex.  After he verified the complaint
by calling another tenant, Rigby walked through the apartment parking lot and
found Gordon lying on the ground.  Rigby
did not see any cars leaving the complex as he left his apartment and walked to
the scene.  At trial, Rigby identified
appellant as “Larry Haynes,” a resident of the complex.[4]

          On
cross-examination, Rigby testified that appellant had never introduced himself
as “Larry Haynes.”  He also recalled
seeing a dark green Lexus at the complex on occasion, in addition to appellant’s
black Lexus.

          Derrell
Davis, whose close friend Victor Uhunmwangho lived at the Beckford Place
Apartments, met appellant through Victor and also knew him as “Zo.”  Derrell testified that he bought a gun at a pawnshop
with appellant and Victor in September 2007. 
Derrell acknowledged that he had previously been diagnosed with “simple
psychosis,” and as a result he needed appellant’s help in answering the
questions on the firearm application that he did not understand.  Derrell testified that appellant gave him the
money for the gun and told him to purchase the gun in Derrell’s own name.  Derrell, who stated that he would receive
“use immunity” for his role in this transaction if he testified truthfully at
trial, admitted that he lied on the paperwork when he answered, at appellant’s
direction, that he was purchasing the gun for himself.  Derrell testified that appellant told him to
purchase a “fat type of Glock,” and that this gun was small and had a chrome
stripe.

          Derrell
testified that, on October 29, he was at Victor’s apartment when appellant
arrived between 5:30 and 6:30 p.m.  Although
Victor eventually left to go to his girlfriend’s house, Derrell and appellant
stayed at Victor’s apartment.  Around
8:00 p.m., Derrell borrowed appellant’s car to go to the mall, and he returned
to the apartment complex around 9:00 p.m. 
When Derrell arrived, he saw appellant speaking to a man in front of Victor’s
apartment.  Appellant came into the
apartment and told Derrell that he had been robbed and that he thought that the
person to whom he had just been speaking was involved.  Derrell and appellant then walked outside,
and appellant said that he was going to shoot the man who robbed him.  Appellant walked over to an unidentified
man’s apartment in the complex, and Derrell walked over to a nearby corner
store.  When Derrell returned, appellant
was sitting on a curb and they spoke again about the robbery.

          As
they walked back to Victor’s apartment, Derrell noticed that appellant had a
pistol with him.  He recognized this
pistol as the one he had purchased for appellant.  Appellant then told Derrell that he wanted to
speak with “Curly,” referring to Gordon. 
Appellant asked Derrell to go to Gordon’s apartment and tell him that appellant
and Victor both wanted their cars washed. 
Derrell testified that he tried to dissuade appellant from shooting
Gordon because “the gun [appellant had] was in [Derrell’s] name.”  After Derrell knocked on Gordon’s door and
Gordon came downstairs, he walked about five to ten feet away as appellant
talked to Gordon.  Approximately six or
seven minutes later, Derrell heard at least two gunshots.  He testified that he looked over and saw appellant
shoot Gordon.

          Derrell
testified that he then got into appellant’s car because he was “spooked” and he
wanted to get away from the scene so he would not get “framed” for the shooting.  He asked appellant to take him home when
appellant tried to hand him the gun.  Once
at home, he called Victor, and, after Victor arrived at his home with his
girlfriend, he told Victor the details of the shooting.  When they returned to Victor’s girlfriend’s apartment,
Derrell decided that he wanted to go back to the scene to determine if Gordon
had died and to cooperate with police. 
Eventually, he spoke with police officers, who put bags around his hands
for a gunpowder residue test.[5]  Derrell testified that he did not immediately
tell the officers what he knew because they were acting rough with him.[6]

          On
cross-examination, Derrell admitted that he had previously been in trouble for
evading arrest, although he denied that he was the same person as listed on an
evading arrest judgment and sentence shown to him by defense counsel.  He further testified that, although he had
held a gun before, he was scared of guns and it would not be true if someone at
the apartment complex said that they had previously seen him with a gun.  When defense counsel introduced two pictures
of appellant and Derrell in which Derrell was holding a gun, Derrell testified
that he was holding appellant’s old gun and that he was holding it “just for
the picture.”

          Victor
Uhunmwangho admitted that he had two prior felony drug convictions.  He testified that he was present for the
purchase of the gun and that Derrell did not buy the gun for himself.[7]  Victor stated that he could not remember what
time he left to go to his girlfriend’s apartment, but he testified that, although
appellant and Derrell had been at his apartment earlier, they were not present
when he left.  He testified that he was
at his girlfriend’s apartment for about thirty to forty-five minutes before he
received a call from Derrell.  After Victor
and his girlfriend picked Derrell up, they talked about the shooting.  Victor testified that they went back to his
girlfriend’s apartment to pick up her vacuum cleaner so she could go over to
his apartment and clean it, which is why they returned to the Beckford Place
Apartments.

          Kandis
Jones, appellant’s girlfriend, testified that she called appellant around 9:00
p.m. on October 29 to ask him what he wanted to eat for dinner.  Later, appellant called Kandis from a
different phone to ask her to unlock her apartment door.  She testified that he arrived at her
apartment around 10:00 p.m., and they ate dinner and watched television
together.  Appellant mentioned that he
thought he had lost his phone, so Kandis called his number twice after 11:00
p.m. to see if he could locate his phone in his car.  Kandis did not remember telling Harris County
Sheriff’s Department Sergeant W. Kuhlman that when she woke up on October 30,
the morning after the shooting, appellant was in her bed and this was the first
time she had seen him since October 27.

          Harris
County Sheriff’s Department Deputy R. Gonzales testified that he recovered four
.380 caliber automatic shell casings at the crime scene.  He later searched a silver Lexus belonging to
Victor and discovered no weapons, bullets, or shell casings.  He also searched appellant’s car and Kandis’s
apartment.  He did not find any evidence
in the vehicle.  When he searched
Kandis’s apartment, he found a shoebox with documents in the name of Larry
Haynes and documents in appellant’s name stating an address at the Beckford
Place Apartments.  Deputy Gonzales also
found a box of Winchester .380 rounds that was missing five bullets.  He testified that, although these bullets
were the same caliber as the shell casings found at the crime scene, they were
made by a different manufacturer.

          Jill
Dupre, from the Harris County Sheriff’s Department firearms lab, testified that
all four shell casings recovered at the scene were fired from the same
weapon.  After comparing and analyzing
both the bullets and the shell casings, she determined that a firearm
manufactured by Hi Point fired the projectiles.[8]  She also testified that the shell casings
recovered at the scene were copper and the Winchester rounds recovered from
Kandis’s apartment were brass, but she further testified that bullets made by
different manufacturers can be fired from the same caliber weapon.

          U.S.
Marshal S. Lowenstein testified regarding appellant’s cell phone records.  Inspector Lowenstein stated that, although the
records were in the name of “Lorenzo King,” the records displayed a billing
address corresponding with Kandis’s apartment and matched the phone number that
Kandis provided for appellant.[9]  He testified that the records, by logging the
particular cell tower activated during a call, could provide a “general location”
of where the phone was located when a call was made or received.  Inspector Lowenstein analyzed the call
activity from, and the cell towers activated by, appellant’s phone number for
several hours surrounding the approximate time of the shooting, and he concluded
that the activated towers were consistent with appellant’s being in the area of
the Beckford Place Apartments at the time of the shooting.  The phone records also corroborated Kandis’s
testimony that she called appellant around 9:00 p.m. and then twice after 11:00
p.m.

          Before
closing arguments began, the trial court informed the parties that they would
each have twenty minutes to present their arguments.  Defense counsel and the trial court then had
the following exchange:

[Defense
counsel]:          Twenty minutes?  Is it possible that we might have a little
bit longer, Your Honor?

 

The
Court:            Based on the length of
the testimony, remember we didn’t start this till Tuesday at 10:00 o’clock and
it’s now 11:48.  They went out at 11:35
on Thursday.

 

Defense counsel did not object to this limitation or
request a specific amount of additional time for argument.

          During
her argument, defense counsel focused on attacking the credibility of the
State’s witnesses, particularly Derrell Davis and Misty Woods.  Defense counsel also addressed the effect of
the passage of time on the ability to detect gunpowder residue and the fact
that multiple witnesses testified that they saw more than one Lexus leave the
apartment complex but all of them “elected not to identify” the driver of the
second Lexus.

          After
the trial court interrupted with a three minute warning, defense counsel noted
that “time is short” and reminded the jury that, although the shell casings
recovered from the crime scene and the bullets found in Kandis’s apartment were
both .380 caliber, the former were copper and the latter were brass.  Counsel urged the jury not to make the “leap”
the State was suggesting—that
because appellant possessed the brass bullets at Kandis’s apartment, he
necessarily possessed the copper bullets used to kill Gordon.

          Defense
counsel briefly argued that the burden of proof never shifted to the defense,
and she implored the jury to hold the State to its burden.  Finally, “because [she] fe[lt] like [she was]
rushing,” counsel briefly mentioned the cell phone records and Inspector
Lowenstein’s testimony that he could only provide a general range of locations
for where appellant could have been when he made or received calls and that he
could not pinpoint a specific location.

          At
the end of her argument, defense counsel did not object to the time limitation,
specifically request more time, or explain why she needed more time to properly
argue the case.  After the jury retired
for deliberations, counsel made a proffer in the presence of the court reporter
of what she would have argued had she been given more time.  The record reflects that neither the trial
court judge nor the prosecutors were present for this proffer.  The record does not indicate whether the
trial court was ever made aware of this proffer.

          The
jury ultimately found appellant guilty of murder and assessed his punishment at
confinement for life.  This appeal
followed.

Improper Limitation of Closing Argument

          In
his sole issue, appellant contends that the trial court violated his Sixth
Amendment right to effective assistance of counsel and his right to be heard by
counsel under Article 1, Section 10 of the Texas Constitution when it
erroneously limited defense counsel’s closing argument to twenty minutes.  The State contends that appellant failed to
preserve this issue for appellate review because defense counsel did not object
to the time limitation or request a specific amount of additional time for
argument and because counsel failed to present a timely proffer to the trial
court.  We agree with the State.

          To
preserve a complaint for appellate review, the appellant must make his
complaint to the trial court by a “timely request, objection, or motion that
state[s] the grounds for the ruling that the complaining party [seeks] from the
trial court with sufficient specificity to make the trial court aware of the
complaint . . . .”  Tex. R. App. P. 33.1(a)(1)(A); see Pena v. State, 285 S.W.3d 459, 464
(Tex. Crim. App. 2009) (“To avoid forfeiting a complaint on appeal, the party
must ‘let the trial judge know what he wants, why he thinks he is entitled to
it, and to do so clearly enough for the judge to understand him at a time when
the judge is in the proper position to do something about it.’  This gives the trial judge and the opposing
party an opportunity to correct the error.”) (quoting Lankston v. State, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) and
citing Reyna v. State, 168 S.W.3d
173, 179 (Tex. Crim. App. 2005)).

          In Barajas v. State, the Corpus Christi
Court of Appeals addressed whether the appellant properly preserved his
complaint that the trial court had abused its discretion in imposing a twenty
minute time limit on closing argument. 
732 S.W.2d 727, 729 (Tex. App.—Corpus Christi 1987, pet. ref’d).  After the State had opened, defense counsel
requested thirty minutes for his argument, which the trial court denied.  Id.  Defense counsel “did not protest the time
limit at the end of his argument.”  Id. 
Counsel made a bill of exceptions, apparently setting out the topics
that he would have discussed if he had received more time to argue, but this
bill was “not presented to the court at trial.” 
Id.  The Corpus Christi court thus concluded that
Barajas had “failed to preserve any error in connection with the time
limitation for closing argument.”  Id.; see
also Dang v. State, 154 S.W.3d 616, 621 (Tex. Crim. App. 2005) (noting that
some courts had considered whether defense counsel objected and “listed the
issues that would be covered if given more time” as factors in determining whether
trial court abused its discretion in limiting argument and then stating that
“some [factors] may be more appropriate to considering whether a defendant has
preserved the complaint for review”);
Madry v. State, 200 S.W.3d 766, 773 (Tex. App.—Houston [14th Dist.] 2006,
pet. ref’d) (holding, even though defense counsel specifically objected to
five-minute argument limitation and requested ten minutes, that appellant
failed to preserve complaint regarding time limit for appellate review because
defense counsel never informed trial court of what topics he would have
addressed if given more time).

          Here,
before the State began its argument, the trial court informed the parties that
they would each have twenty minutes for argument.  Defense counsel then asked, “Is it possible
that we might have a little bit longer, Your Honor?”  Counsel did not propose a specific length of
time for argument as an alternative.  The
trial court responded, “Based on the length of the testimony, remember we
didn’t start this till Tuesday at 10:00 o’clock and it’s now 11:48 [on
Thursday].  They went out at 11:35 on
Thursday.”  Appellant’s counsel did not
make any further comment and did not specifically object to the time
limitation.

          After
the trial court interrupted her argument with a three-minute warning, defense
counsel noted that her “time is short.”  She
also prefaced her brief remarks about Inspector Lowenstein’s testimony, which
was the last topic that she discussed, with the statement, “One other sidebar
note, because I feel like I’m rushing . . . .”  At the end of her argument, counsel did not
object to the time limitation; she did not request additional time; she did not
explain to the trial court why she needed additional time; and she did not immediately
inform the trial court of the topics that she was unable to discuss due to the
time limitation.  After the jury had
already retired for deliberations, defense counsel made a proffer to the court
reporter concerning the topics that she would have discussed had she been given
more time to argue; however, the record explicitly states that this proffer was
made outside of the presence of the trial court judge.  The record does not indicate that the trial
court was ever made aware of the contents of this proffer.

          Because
defense counsel failed to specifically object to the time limitation imposed by
the trial court, to request a specific amount of time needed for argument, to
explain why counsel needed additional time for argument, and to make a timely
proffer before the trial court, we conclude that appellant failed to preserve
for appellate review his complaint that the trial court abused its discretion
by limiting closing arguments to twenty minutes.  See
Barajas, 732 S.W.2d at 729; see also
Pena, 285 S.W.3d at 464 (noting that, to preserve error, appellant must let
trial court know specifically what he wants at time when trial court “is in the
proper position to do something about” complaint).

          We
overrule appellant’s sole issue.




 

Conclusion

          We
affirm the judgment of the trial court.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Higley, and Massengale.

Do
Not Publish.  Tex. R. App. P. 47.2(b).











[1]
          See Tex. Penal Code Ann.
§ 19.02(b)(1) (Vernon 2011).





[2]
          All of the fact witnesses
testified that appellant drove a black Lexus with “504” stickers on the
fenders.

 





[3]
          On cross examination, Misty
acknowledged that she did not tell anyone about this statement of Gordon’s until
July 2008 during an interview with the district attorney’s office before a
prior trial setting.





[4]
          Vilma Chavez, a former leasing
agent at the complex, testified that Apartment 1016 was rented by a man named
Larry Haynes, and she identified appellant as the man she knew as Larry Haynes.





[5]
          Harris County Sheriff’s
Department Deputy R. Gonzales, a crime scene investigator, testified that he
performed the gunpowder residue tests on Derrell and Victor at approximately
3:30 a.m.  William Davis, the trace evidence
manager at the Harris County Medical Examiner’s Office, testified that neither
test indicated the presence of gunpowder residue.  He also testified that the residue transfers
to other surfaces easily, that any activity with the hands can transfer the
residue, and that the likelihood of discovering the residue decreases
significantly with the passage of time after the discharge of the weapon.

 





[6]
          Harris County Sheriff’s
Department Sergeant D. Holtke testified that he spoke with Derrell at the
scene, and he was acting very nervous. 
At first, Derrell denied knowledge of the shooting and denied knowing an
individual named “Zo.”  Derrell became
more forthcoming after Sergeant Holtke showed him pictures recovered from
Victor’s apartment that displayed Derrell with Victor and appellant.  Sergeant Holtke further testified that he was
never rough or intimidating with Derrell.

 





[7]
          On cross-examination, Victor
testified, contrary to Derrell’s testimony, that he stayed outside during the
purchase of the gun and, therefore, he did not help Derrell complete the
application.





[8]
          The trial court admitted Derrell
Davis’s application to purchase a firearm. 
This application reflects that Derrell purchased a .380 caliber pistol
manufactured by Hi Point.

 





[9]
          Kandis Jones testified that she
calls appellant “King,” and Deputy Gonzales testified that he observed a
stuffed teddy bear displaying “King” when he searched Kandis’s apartment.